IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GARY HIRSH,<br><br>          Plaintiff,<br><br>          v.<br><br>FERNANDO LECUONA,<br><br>          Defendant. | 8:06CV13<br><br>MEMORANDUM OPINION<br>AND ORDER |

      This matter is before the court for resolution of the issue of punitive damages and on the plaintiff's motion to strike, Filing No. 100.  The court requested briefing on the punitive damage issue.  Filing No. 92.

      Following a trial in this case, the jury found in favor of the plaintiff Gary Hirsh on his claim of deprivation of First Amendment rights and awarded $391,000 in actual damages and $350,000 in punitive damages against defendant Fernando Lecuona.  Filing No. 84. The court later awarded front pay in the amount of $386,184 to Hirsh, but withheld entry of judgment pending the resolution of punitive damage issues.  Filing No. 86.

      In his brief on punitive damages, the plaintiff urges the court to enter judgment for punitive damages in accordance with the jury's verdict.  He argues that the jury was properly instructed on the issue and that the evidence supports the award.  He further asserts that the award is not out of proportion to the award of actual damages in the case. The defendant argues that if the damages are allowed to stand, Lecuona could be held personally liable and required to pay the damages out of his own pocket.  He argues that the punitive damages were awarded without regard to Lecuona's ability to pay the

judgment, noting that "the state may very well be precluded from paying damages on Lecuona's behalf" under Neb. Rev. Stat. § 81-8239.05(4). He argues that he cannot pay the judgment without liquidating his assets, and submits an affidavit to that effect. Filing No. 99, Part 2, Affidavit of Fernando Lecuona. Lecuona further contends that the punitive damages award is disproportionate under the law and is so large that it shocks the conscience and violates his due process rights. Lecuona urges the court to either grant a remittitur of punitive damages or to grant a new trial on damages.

Hirsh has moved to strike Lecuona's affidavit. Filing No. 100. In support of the motion, he argues that Lecuona failed to provide evidence of his ability to pay at trial. He objects to consideration of the affidavit in connection with the court's entry of judgment for punitive damages for the reason that the information presented in the affidavit was never submitted to the jury.

## DISCUSSION

### *Facts*

This is an action for deprivation of rights protected by the First Amendment that involves the discipline and eventual termination of the plaintiff, Gary Hirsh, as director of the State of Nebraska's Department of Labor, Workforce Development Office, by defendant Fernando Lecuona, the Commissioner of Labor for the State of Nebraska. In a ruling on the defendant's motion for summary judgment earlier in these proceedings, the court found that undisputed evidence established that the plaintiff was speaking on a matter of public concern but denied the defendant's motion because there remained other genuine issues of material fact. Filing No. 55. In the pretrial order, the parties agreed that certain facts had been established and stipulated that transcriptions of tape-recorded

meetings between Lecuona and Hirsh on March 31, 2008, and May 18, 2008, were true and accurate. Filing No. 62, Pretrial Order at 3-4. The statements at issue in the litigation were made by Hirsh at those meetings, and also in certain e-mail correspondence. *See* Tr. Ex. 61, Transcript of March 31, 2005, Meeting at 6-9, 22-26; Tr. Ex. 62, Transcript of May 18, 2005, Meeting at 11; Tr. Ex. 9, E-mail dated March 15, 2005. In the conversations and correspondence, Hirsh asserted that his subordinates had a right to testify in front of the state legislature as citizens and on their own time. At the outset of the trial, the court determined, as a matter of law, that Lecuona acted within the course and scope of his employment in disciplining and terminating Hirsh, and that he accordingly acted "under color of state law."[1]

At trial, Hirsh produced evidence and testimony on the events that led to his termination. Uncontroverted evidence established that Hirsh's termination was motivated, at least in part, by those statements. The Department of Labor's official written legislative policy provides that communication with members of the legislature or state or federal officials regarding the Department's official policy is the responsibility of the Commissioner of Labor or his designee, but that "[n]othing contained in this policy is intended to or should be interpreted to limit any employee's right to express themselves as an individual." *See* Tr. Ex. 6, Nebraska Workforce Development Legislative Policy at 1. Lecuona testified he was aware of the policy and of the Legislature's rules that encouraged state employees to

---

[1] This fact is established as a matter of law. The First Amendment can only be violated by a state actor. U.S. Const. amend I; *Denver Area Educ. Telecom. Consortium, Inc. v. F.C.C.,* 518 U.S. 727, 737 (1996) (stating "the First Amendment, the terms of which apply to governmental action, ordinarily does not itself throw into constitutional doubt the decisions of private citizens to permit, or to restrict, speech."). Lecuona lacks authority, as an individual or as a private citizen, to dictate the terms and conditions of Hirsh's employment.

testify.  *See* Tr. Ex. 45, Rule 3, Legislative Rules at 20.  He testified he was also aware of a 1986 report by the State of Nebraska's Office of Public Counsel/Ombudsman which was addressed specifically to employees' exercise of First Amendment rights and which described "the outer limits of the constitutional authority of agencies to control communication of their employees with the legislature."  *See* Tr. Ex. 22, Office of Public Counsel/Ombudsman Memorandum at 1.  The standards developed by the Office of Public Counsel prohibited interference with state employees' right to testify, and specifically stated that annual leave could not be unreasonably denied to employees who wished to testify.  *Id.*, Report, Review of the Legislative Protocol of the Department of Labor at 37.

In contravention of those policies, Lecuona told Hirsh at the March 31, 2005, meeting that Hirsh's employees were wrong to "show up" to testify, that they did not have a right to do so, and that Hirsh could deny them annual leave to prevent them from testifying.  *See* Tr. Ex. 61, Transcript of Meeting (March 31, 2005) at 6-9, 22-26; Tr. Ex. 62, Transcript of Meeting (May 18, 2005) at 11.  Lecuona characterized Hirsh's expression of disagreement with that position as "insubordination."  *See* Tr. Ex. 13, Notice of Allegations at 2; Tr. Ex. 34, Notice of Allegations at 8-9.

The Department of Labor's chief legal officer, John Albin, acknowledged that it would violate the Department of Labor's written policy to tell a supervisor to deny annual leave to an employee who wished to testify.  The evidence also showed that for fourteen to fifteen years, prior to each legislative session, Lecuona told Hirsh that he did not want employees under Hirsh's supervision to testify before a legislative committee unless Lecuona asked them to testify.  Although Lecuona may never have ordered Hirsh to deny annual leave to any employees to testify, the evidence shows that Lecuona had expected

4

Hirsh to do so. Both Lecuona and the Department's legal counsel sent several e-mails to Hirsh stating that Hirsh's employees' testimony to the legislature had done "immeasurable damage to the reputation" of the office and was "problematic for the agency." *See* Tr. Exs. 7 & 8, E-mails dated March 14, 2005, and March 15, 2008.

The evidence also shows that from March 17, 2005, to July 12, 2005, Lecuona executed a plan to terminate Hirsh's employment. *See* Tr. Exs. 13, Memorandum, Notice of Allegations; Tr. Ex. 34, Memorandum, Notice of Disciplinary Action. He did not contact the Human Resources Department in connection with the discipline or termination of Hirsh. In April and May of 2005, Lecuona repeatedly demanded that Hirsh return to work even though Hirsh's doctors stated he was unable to do so. *See* Tr. Ex. 34, Memorandum, Notice of Disciplinary Action at 10. Lecuona did not contact any outside physicians to either substantiate or contradict Hirsh's doctors' opinions. Lecuona then ordered Hirsh to return to work in contravention of Hirsh's doctors' orders, in spite of the fact that Hirsh had ample sick leave available. *Id.* On July 12, 2005, Lecuona fired Hirsh. *Id.* at 12. Lecuona acknowledged that three of the six disciplinary allegations against Hirsh involved the dispute over legislative testimony by employees under Hirsh's supervision. *See, e.g.,* Tr. Ex. 13, Notice of Allegations at 1-2; Tr. Ex. 34, Notice of Allegations at 7-8.

At the close of evidence, the court ruled as a matter of law that Hirsh's statements had been made as a private citizen speaking on a matter of public concern and the speech was protected under the First Amendment.[2] The State of Nebraska's policies, in

---

[2]In making this finding, the court rejected the defendant's contention that Hirsh's statements were made as part of his overall supervisory duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006) (when an employee is "simply performing his or her job duties," and not "speaking as a citizen addressing a matter of public concern," there is no warrant for "a delicate balancing of the competing interests surrounding the speech and its consequences"). Denying a subordinate his or her First Amendment rights cannot be within

5

conformity with Supreme Court First Amendment precedent, allowed state agency employees to testify as individuals on their own time and to use annual leave to do so. Hirsh's statements conformed to the State's policies and to the law. Contrary to the State's announced position, defendant Lecuona established an unwritten policy that would discourage or prevent Department of Labor employees from testifying and Lecuona expected Hirsh to discourage or prevent his subordinates from testifying. Hirsh's disagreement with this unwritten policy was a factor in his termination. Lecuona's own disciplinary allegations against Hirsh establish that Lecuona's decisions to discipline Hirsh, and ultimately to fire him, were based, at least in part, on Hirsh's statements that expressed the opinion that public employees have a right to testify as private citizens. Accordingly, the court found that the essential elements of the plaintiff's claim of retaliation for exercise of First Amendment rights had been satisfied.[3]

---

a supervisor's official duties or job description. *See Connick v. Myers*, 461 U.S. 138, 142 (1983) (stating "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."). The evidence shows that Hirsh would have fulfilled supervisory duties under the State's and the Department's official written legislative policies by allowing his subordinates to testify as individuals on their own time, not by denying them leave to do so. When Hirsh spoke out in defense of a public employee's right to testify in the legislature as a private citizen, he did not speak as an employee on a matter of his personal interest. To the contrary, it would have inured to Hirsh's personal interest to have followed Lecuona's unconstitutional "unwritten policy," potentially preserving his employment.

The court also found, as a matter of law, that Hirsh's right to free speech outweighed the interests of the public employer in preventing workplace disruption because Lecuona had not presented any evidence that the speech disrupted the workplace or affected morale. *See Gunter v. Morrison,* 497 F.3d 868, 873 (8th Cir. 2007); *Washington v. Normandy Fire Protection Dist.,* 272 F.3d 522, 526 (8th Cir. 2001) (noting that the defendant "must demonstrate with specificity that the speech created disharmony in the workplace, impeded the plaintiff's ability to perform his duties, or impaired working relationships with other employees."); *see also Pickering v. Board of Educ.,* 391 U.S. 563, 568 (1968). The *Pickering* balancing test is also a question of law, although underlying factual issues should be submitted to the jury. *Bailey v. Department of Elementary and Secondary Educ.,* 451 F.3d 514, 518 n.2 (8th Cir. 2006).

[3]Those elements are:

1. That the plaintiff engaged in speech as a private citizen on a matter of public concern.

2. That the plaintiff's e-mail statements of March 15, 2005, statements of March 31, 2005, to the defendants, or either of them, played a part in the decision to terminate the plaintiff.

6

The issue of whether the defendant had proved, by a preponderance of the evidence, that he would have terminated the plaintiff regardless of Hirsh's exercise of First Amendment rights was submitted to the jury, as was the issue of damages, including punitive damages. In answer to a special interrogatory, the jury found that the defendant had not proved, by a preponderance of evidence, that "he would have made the decision to terminate the plaintiff, regardless of the plaintiff's e-mail statement of March 15, 2005, or verbal statements of March 31, 2005 or May 18, 2005." Filing No. 84, Special Interrogatories. The jury was instructed:

> If you find by a preponderance of the evidence that the plaintiff's termination was motivated by an evil motive or intent, or that the defendant acted with reckless indifference to the plaintiff's rights, then in addition to any other damages to which you find the plaintiff entitled, you may, but are not required to, award the plaintiff an additional amount as punitive damages.

Filing No. 90, Jury Instruction No. 24, Jury Instructions at 31. Reckless indifference was defined in the instructions as follows: "The defendant acted with reckless indifference if it has been proved, by a preponderance of evidence, that the defendant knew that the plaintiff's termination was in violation of the law prohibiting retaliation for exercise of First Amendment rights or that he acted with reckless disregard of that law." *Id.* In determining the amount of punitive damages to award, the jury was instructed to consider:

> 1. The offensiveness of the defendant's conduct. In this regard, you may consider whether the harm suffered by the plaintiff was physical or economic or both; whether there was violence, deceit, intentional malice, or reckless disregard for human health or safety; whether others were harmed by the same conduct of the defendant that harmed the plaintiff; and whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the plaintiff.

---

The jury was instructed at the beginning of the trial that the court would determine as a matter of law whether the plaintiff satisfied the first element. *See McGee v. Public Water Supply, Dist. No. 2,* 471 F.3d 918, 920 (8th Cir. 2006), noting that determination of whether a public employee's speech is protected by the First Amendment is a question of law for the court).

7

2. The harm that the defendant's wrongful conduct actually caused the plaintiff.

3. The amount of punitive damages, in addition to the other damages already awarded, that would be necessary, considering the defendant's financial condition, to punish the defendant and to deter the defendant and others from similar wrongful conduct in the future.

*Id.* at 31-32.

**Law**

Punitive damages can be awarded against municipal employees, but not against the governmental entity itself. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981). A jury is permitted to assess punitive damages in an action under 42 U.S.C. § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade,* 461 U.S. 30, 56 (1983). The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. *See Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535 (1999) (noting that punitive damages may be inappropriate where an employer believes his actions are lawful). This intent standard, "at a minimum, require[s] recklessness in its subjective form[,]" for example, "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Id.* at 536 (*quoting Smith v. Wade,* 461 U.S. at 37, n.6, 41). The recklessness standard can be compared "to the requirement that defendants act with 'knowledge of falsity or reckless disregard for the truth' before punitive awards are available in defamation actions." *Id.* (*quoting Smith,* 461 U.S. at 50) (further noting that "wantonness" in a punitive damages context can be described in terms of "criminal

indifference," and "gross negligence" can be described in terms of a "conscious indifference to consequences").

Punitive damages are thus appropriate on a showing that a defendant acted "in the face of a perceived risk that [his] actions [would] violate federal law." *Id.* The policies underlying punitive damages are punishment and deterrence. *Boerner v. Brown & Williamson Tobacco Co.,* 394 F.3d 594, 601 (8th Cir. 2005). With respect to deterring the infringement of First Amendment rights in the public employment contest, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe,* 543 U.S. 77, 82 (2004) (per curiam) (noting that "[w]ere [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues."); *United States v. National Treasury Emps. Union*, 513 U.S. 454, 470 (1995) (noting that a "large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said.").

Punitive damages focus on the enormity of the offense, rather than the measure of compensation to the victim. *Exxon,* — S. Ct. —, —, 2008 WL 2511219, *12 (June 25, 2008) (noting that "punitives are aimed not at compensation but principally at retribution and deterring harmful conduct"). The prevailing rule limits punitive damages to cases "where a defendant's conduct is 'outrageous,' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable." *Id.* (citations omitted). "Degrees of relative blameworthiness are apparent." *Id.* (discussing the spectrum of punishable culpability, from reckless to willful or malicious).

The Due Process Clause of the Fourteenth Amendment, prohibits the imposition of a grossly excessive punishment on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). The district court is required by the Due Process Clause to undertake an examination of a punitive damages award. *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1048 (8th Cir. 2002) (applying the *Gore* analysis to review a federally-imposed punitive damages award); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 20 (1991). "In most American jurisdictions the amount of the punitive award is generally determined by a jury in the first instance, and that 'determination is then reviewed by trial and appellate courts to ensure that it is reasonable.'" *Exxon Shipping Co. v. Baker,* — S. Ct. at —, 2008 WL 2511219 at *14 (*quoting Haslip*, 499 U.S. at 15).

In undertaking this review, the court does not engage in a remittitur, "'unlike a remittitur, which is discretionary . . . a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.'" *Ross,* 293 F.3d at 1049 (*quoting Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1331 (11th Cir. 1999); *see also Grabinski v. Blue Springs Ford Sales, Inc.,* 136 F.3d 565, 571 (8th Cir. 1998) (stating "[n]ot only are punitive damages a legal remedy, but the trial court had a duty under state and federal law to review the awards for excessiveness."), *rev'd in part on other ground,* 203 F.3d 1024 (8th Cir. 2000).

There are three guideposts to assess the propriety of a punitive damage award. *Gore,* 517 U.S. at 575. "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* The court should consider five factors with respect to reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct

evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *State Farm Mut. Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003). The punitive damage award is not doomed, however, simply because some factors weigh in the defendant's favor. *Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820, 839 (8th Cir. 2005).

In assessing reprehensibility, it is crucial that a court focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general. *Williams v. ConAgra Poultry Co.,* 378 F.3d 790, 797 (8th Cir. 2004). Punitive damages must be assessed to punish and deter conduct that bears a relationship to the plaintiff's harm—a defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. *Campbell,* 538 U.S. at 422. Also, punitive damages cannot be assessed to punish a defendant for harm to a nonparty victim. *Philip Morris USA v. Williams,* — U.S. —, —, 127 S. Ct. 1057, 1063 (2007).

The second and "perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 581; *see also Exxon,* — S. Ct. at —, 2008 WL 2511219 at *21 (establishing a 1:1 ratio of punitive to compensatory awards as a fair upper limit in maritime cases involving reckless conduct). "'[P]unitive damages should be proportional to the wrongfulness of the defendant's actions.'" *Conseco Fin. Serv. Corp. v. North Amer. Mortgage Co.,* 381 F.3d 811, 825 (8th Cir. 2004) (*quoting Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672, 676 (7th Cir.2003)). Courts are reluctant to identify any concrete

constitutional limit, or mathematical "bright-line" formula, on the ratio between the harm, or potential harm, to the plaintiff and the punitive damages award. *Campbell,* 438 U.S. at 424-25. In practice, however, few awards that exceed, to a significant degree, a single-digit ratio between punitive damages and compensatory damages will satisfy due process. *Id.*; *Exxon,* — S. Ct. at —, 2008 WL 2511219 at *16. Also, a punitive damages award that is "only equal to compensatory damages" may be appropriate when compensatory damages are substantial. *See Campbell,* 438 U.S. at 425.

The final "guidepost" requires a comparison of the punitive damages award to the civil or criminal penalties that could be imposed for comparable misconduct. *Gore,* 517 U.S. at 583. Some courts interpret this guidepost as calling for a comparison with other punitive damage awards in order to satisfy the requirement that the tortfeasor receive "fair notice" that his wrongful conduct could entail a substantial punitive award when "criminal penalties for similar misconduct are middling." *See Lee v. Edwards*, 101 F.3d 805, 811-12 (2d Cir. 1996).

In pre-*Gore* cases the Supreme Court noted that while the wealth of the wrongdoer must not be unduly emphasized, a jury may consider the defendant's wealth in determining punitive damages. *See TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 463-64 (1993); *Haslip,* 499 U.S. at 21-22. Under federal law, the burden of showing net worth is placed on the defendant. *Grabinski,* 136 F.3d at 571 (stating "as a matter of federal law it is a defendant's burden to introduce evidence of net worth before a jury for purposes of minimizing a punitive damages award."); *Horney v. Westfield Gage Co.,* 77 Fed. App'x 24, 34-35, 2003 WL 22326558, **7-**8 (1st Cir. 2003) (not selected for publication); *Provost v. City of Newburgh*, 262 F.3d 146, 163 (2d Cir. 2001); *Mason v. Oklahoma Turnpike Auth.,* 182 F.3d 1212, 1214 (10th Cir. 1999); *Kemezy v. Peters,* 79 F.3d 33, 36 (7th Cir. 1996);

*Hutchinson v. Stuckey,* 952 F.2d 1418, 1422 n.4 (D.C. Cir. 1992); *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 373 (2d Cir. 1988); *Fishman v. Clancy,* 763 F.2d 485, 490 (1st Cir. 1985); *Woods-Drake v. Lundy,* 667 F.2d 1198, 1203 n. 9 (5th Cir. 1982). A "'defendant who cannot pay a large award of punitive damages can point this out to the jury so that they will not waste their time . . . by awarding an amount that exceeds his ability to pay.'" *Grabinski*, 136 F.3d at 571 (*quoting Kemezy,* 79 F.3d at 36) (ellipses in *Grabinski).* In the Eighth Circuit, a defendant's failure to put on evidence of his net worth constitutes a waiver. *Grabinski,* 136 F.3d at 570-71; *see also Latham Seed Co. v. Nickerson Am. Plant Breeders, Inc.,* 978 F.2d 1493, 1500 (8th Cir. 1992) (affirming an award of punitive damages where the defendant had an opportunity to provide the jury with information on net worth, but failed to do so).

Also, "[t]he defendant should not be allowed to plead poverty if his employer or an insurance company is going to pick up the tab." *Kemezy,* 79 F.3d at 37. When the defendant is to be fully indemnified, evidence of net worth "far from being required, is inadmissible." *Id.* With respect to indemnification, Nebraska law provides:

> (1) The State of Nebraska shall indemnify its officials and employees and its past officials and employees for money damages and reasonable costs incurred as a result of an act or omission occurring in the course and scope of employment of such official or employee after May 22, 1981. Such official's or employee's right to indemnification shall include the payments of awards, settlements, and associated costs, including appeal bonds and reasonable costs associated with a required appearance before any tribunal.

Neb. Rev. Stat. § 81-8,239.05(1). This indemnification provision does not apply "in case of malfeasance in office or willful or wanton neglect of duty." Neb. Rev. Stat. § 81-8239.06(2). Further, "any portion of an award or settlement which is for punitive damages may only be paid with the approval of the Legislature." Neb. Rev. Stat. § 81-8,239(4).

13

Another Nebraska statute provides for representation by the Attorney General of state employees against whom civil actions are brought, "unless after investigation [the Attorney General] finds that the claim or demand does not arise out of an alleged act or omission occurring in the course and scope of employment or that the act or omission complained of amounted to malfeasance in office or willful or wanton neglect of duty, in which case the Attorney General shall give that person written notice that defense of the claim or representation before the tribunal has been rejected." Neb. Rev. Stat. § 81-8239.06(1). "Therefore, sections 81-8,239.05 and 81-8,239.06 establish a system whereby state officials and employees sued in civil actions not covered by the State Tort Claims Act can obtain legal representation by the Attorney General and indemnification of all costs and judgments, so long as the particular lawsuit arises out of an act or omission of the official or employee in the course and scope of his or her state employment. . . . However, note that these indemnification and legal representation provisions would not apply in cases involving malfeasance in office, willful or wanton neglect of duty, or an act or omission occurring outside the course and scope of employment." 1993 Neb. Op. Att'y Gen. 93095, 1193 WL 478431 (1993). Conduct-defining terms such as malfeasance and "willful and wanton" imply a state of mind that is more culpable than "reckless disregard." *See, e.g., Ehlers v. Gallagher,* 22 N.W.2d 396, 403 (Neb. 1946) (interpreting malfeasance to mean willful or corrupt behavior).

**Analysis**

The court finds that the evidence presented at trial supports the jury's award of punitive damages in this case. The evidence establishes that defendant knowingly acted in callous disregard of Hirsh's First Amendment rights. The timing of the events at issue supports a finding that Lecuona intentionally fired Hirsh in part as a retaliation for Hirsh's

14

speaking out about employee testimony in front of the Legislature. The jury could reasonably infer that Hirsh's termination was intended to indirectly accomplish a result that Lecuona could not implement under the State's and the Labor Department's own rules, that is, preventing testimony to the Legislature by staff. Lecuona divulged his department's true "unwritten policy" on staff testimony in the taped conversations with Hirsh. Lecuona's admitted "unwritten policy" contravened the Legislature's rules, the official Department of Labor written policy and the Ombudsman's report. Each of the official policies had been drafted in response to Supreme Court caselaw regarding the First Amendment rights of public employees and all were well known to Lecuona.

The fact that Lecuona did not seek input or advice from Human Relations personnel is evidence that he consciously avoided any legal impediments that might interfere with his plan to fire Hirsh. Also, Lecuona's failure to seek outside medical consultations to either corroborate or contradict the opinions of Hirsh's treating physicians supports an inference that Hirsh's "sick leave" issue was a sham and a pretext for retaliation for exercise of First Amendment rights and is further evidence of his reckless disregard for those rights.

The First Amendment protects not only an individual's right to speech but the public's right to receive information. Testimony by public employees with some level of expertise on matters of public concern is at the heart of speech protected by the First Amendment. The consequence of the defendant's retaliation for Hirsh's exercise of his First Amendment rights was not only the loss of Hirsh's livelihood, after a career spanning over thirty years, but would discourage others from speaking out for fear of the loss of their jobs and livelihood. Lecuona's offensive conduct calls for deterrence and punishment over and above that provided by a compensatory award. The harshness of the adverse action taken against Hirsh justifies a substantial exemplary award to deter such actions.

Moreover, the court finds the amount of the award is not excessive. With respect to the reprehensibility of the defendant's conduct, the court finds that, although the harm inflicted on the plaintiff was largely economic as opposed to physical, the plaintiff suffered a significant loss as well as the intangible and abstract injury of infringement of a constitutional right. Hirsh suffered a significant loss of income and irreparable harm to his career. He also suffered considerable emotional distress as a result of Lecuona's actions. Hirsh was especially vulnerable, in that his livelihood was dependent on Lecuona. Lecuona's action was more than an isolated incident. It involved the infringement of Hirsh's First Amendment rights over several years, culminating in his termination.

Further, although the conduct may not have been the "result of intentional malice, trickery, or deceit," it was more than a "mere accident." Defendant's tortious action can be characterized as "worse than negligent, but less than malicious." *See Exxon,* — S. Ct. at —, 2008 WL 2511219 at *20. Accordingly, the court finds that the reprehensibility of the defendant's conduct warrants a significant punitive award.

The second guidepost in determining the propriety of the punitive damages award is its relative proportionate relationship to the compensatory damages award. The ratio of the award in this case is either slightly less than 1:1, if the punitive award is compared only to the compensatory damages award; or, slightly less than 1:2, if the court's award of front pay is included in the analysis. These ratios are lower than the 1:1 ratio recently approved by the Supreme Court for maritime cases that involve reckless conduct. See *Exxon,* — S. Ct. at —, 2008 WL 2511219 at *21. Both ratios would be below those approved in other cases for similar conduct. *See, e.g., Rodriguez-Marin v. Rivera-Gonzalez,* 438 F.3d 72, 85 (1st Cir. 2006) (approving punitive damages that were less than the compensatory award for one plaintiff and less than twice the compensatory award for the other plaintiff

16

in a First Amendment case); *Moskowitz v. Coscette,* 3 Fed. App'x 1, 6-7 (2d Cir. 2001) (approving award of punitive damages of sixty percent of compensatory damages in a public employment/First Amendment case). The ratio of damages in this case is similarly lower than those approved by the Eighth Circuit Court of Appeals in other cases. *See, e.g., Rowe v. Hussmann Corp.,* 381 F.3d 775, 784 (8th Cir. 2004) (approving 2:1 ratio on a Title VII sexual harassment claim); *MacGregor v. Mallinkrodt, Inc.,* 373 F.3d 923, 931 (8th Cir. 2004) (approving 2:1 ratio in a discrimination case); *Kimbrough v. Loma Linda Dev., Inc.,* 183 F.3d 782, 785 (8th Cir. 1999) (approving 10:1 ratio in *quid pro quo* sexual harassment case); *United States v. Big D Enters., Inc.,* 184 F.3d 924, 934-35 (8th Cir. 1999) (approving 100:1 ratio in Fair Housing Act race discrimination case); *Dean v. Olibas,* 129 F.3d 1001, 1006 (8th Cir. 1997) (approving 14:1 ratio in a malicious prosecution case); *Foster v. Time Warner Entm't Co.,* 250 F.3d 1189, 1197 (8th Cir. 2001) (approving 1.8:1 ratio in a retaliation case under the Americans with Disabilities Act); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1068 (8th Cir. 1997) (approving 3:1 ratio in race and national origin discrimination case); *Ross v. Kansas City Power & Light Co.,* 293 F.3d at 1049 (approving 10:1 ratio in a race discrimination case). In view of these comparable awards, the punitive damages award in this case also satisfies the third guidepost, the comparison of the punitive damages award to the civil or criminal penalties that could be imposed for comparable misconduct.

Lecuona's argument that the punitive damages award is unjust because he may have to pay the judgment out of his own pocket is misplaced. The burden was on Lecuona to produce evidence of his net worth in mitigation of any punitive damages award. He would have been precluded from presenting that evidence if a potential judgment were indemnified. Nebraska law provides for the indemnification of its employees for acts or

17

omissions that occur within the course and scope of employment. The Nebraska Attorney General undertook the representation of Lecuona, thereby tacitly finding that Lecuona's acts were within the course and scope of his employment and did not amount to malfeasance in office or willful or wanton neglect of duty.

The court presumes that counsel and his client would have discussed Lecuona's exposure to personal liability and would have presented evidence of net worth in mitigation if Lecuona were to be held personally responsible. The defense decision not to present such proof shows that the plaintiff and his counsel must have assumed that the State would indemnify the judgment. Lecuona would have, and should have obtained his own counsel if that were not the case. In any event, the failure to present evidence of net worth constitutes a waiver. Accordingly, the court finds the plaintiff's motion to strike the affidavit submitted in support of the defendant's position on the punitive damages issue should be granted.

The defendant argues that it is "probable" that the State of Nebraska will not pay any punitive damages on Lecuona's part as a result of this lawsuit. That contention is unsupported and premature. The Nebraska indemnification statute precludes indemnification only for malfeasance in office and willful or wanton neglect of duty. Liability for punitive damages was imposed in this case for conduct that amounted to "reckless indifference," a lower standard of culpability than malfeasance in office or willful or wanton neglect. There has been no showing that the State Legislature would not approve such an award, especially in view of the Attorney General's tacit finding that Lecuona's acts should be indemnified which is inherent in his representation of Lecuona.

The court finds the punitive damages awarded by the jury are supported by evidence and are not excessive.  For the reasons stated above, the court finds plaintiff's motion to strike should be granted.  Accordingly,

IT IS ORDERED:

1.   The plaintiff's motion to strike (Filing No. 100) the defendant's affidavit (Filing No. 99, Attachment 1, Document # 99-2) is granted.

2.   The defendant's affidavit is stricken and will not be considered by the court.

3.  A judgment in conformity with this Memorandum Opinion and Order will issue contemporaneously herewith.

DATED this 18th day of July, 2008.

BY THE COURT:


s/Joseph F. Bataillon
Chief District Court Judge